AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>Florence KONG<br><br>*Defendant(s)* | )<br>)<br>) Case No. 3:20-mj-70684 JCS<br>)<br>)<br>)<br>) |

**FILED**
Jun 01 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of March 4, 2020 in the county of San Mateo in the
Northern District of California , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 1001(a)(2) | False Statement to a Government Agency |

This criminal complaint is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

Approved as to form  *David J. Ward*
AUSA   David J. Ward

s/
*Complainant's signature*

Tyler Nave, Special Agent, FBI
*Printed name and title*

Sworn to before me ~~and signed in my presence~~.
☒ by telephone

Date: June 1. 2020

*Judge's signature*

City and state: San Francisco, CA
Hon. Joseph C. Spero, Magistrate Judge
*Printed name and title*

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: [X] COMPLAINT  [ ] INFORMATION  [ ] INDICTMENT  [ ] SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

## OFFENSE CHARGED

18 U.S.C. § 1001(a)(2) - False Statement to a Government Agency

[ ] Petty
[ ] Minor
[ ] Misdemeanor
[X] Felony

PENALTY:
5 Years Imprisonment
$250,000 fine
3 Years Supervised Release
$100 Special Assessment

### DEFENDANT - U.S
▶ KONG, Florence

DISTRICT COURT NUMBER

## PROCEEDING

Name of Complaintant Agency, or Person (& Title, if any)
Federal Bureau of Investigation

[ ] person is awaiting trial in another Federal or State Court, give name of court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:
[ ] U.S. ATTORNEY  [ ] DEFENSE

SHOW DOCKET NO.

[ ] this prosecution relates to a pending case involving this same defendant

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form: David L. Anderson
[X] U.S. Attorney  [ ] Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): David J. Ward

### DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) [X] If not detained give date any prior summons was served on above charges ▶

2) [ ] Is a Fugitive

3) [ ] Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) [ ] On this charge

5) [ ] On another conviction  } [ ] Federal [ ] State

6) [ ] Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? [ ] Yes  [ ] No
If "Yes" give date filed

**DATE OF ARREST** ▶ Month/Day/Year
Or... if Arresting Agency & Warrant were not
**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year

[ ] This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:
[ ] SUMMONS  [X] NO PROCESS*  [ ] WARRANT   Bail Amount:

If Summons, complete following:
[ ] Arraignment  [ ] Initial Appearance
Defendant Address:

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:   Before Judge:

Comments:

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Tyler Nave, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, hereby depose and state the following:

**I.      INTRODUCTION AND AGENT QUALIFICATIONS**

   **A.      Count One**

   1.      I submit this affidavit in support of a criminal complaint against Florence KONG. KONG owns a construction company, Kwan Wo Ironworks, that does business with the City of San Francisco, directly at times, and also at times as a subcontractor for other construction companies who hold the primary contract with the city. KONG also owns a construction debris recycling company, SFR Recovery Inc., that also does business directly with the City of San Francisco.

   2.      As set forth below, there is probable cause to believe that on or about March 4, 2020, KONG made materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of 18 U.S.C. § 1001(a)(2). Specifically, KONG made the following false statements to Special Agents of the FBI, related to her communications with Mohammed Nuru, then the Director of the San Francisco Department of Public Works:

   a.   KONG said that she and Nuru were friends but they do not discuss business;

   b.   KONG said Nuru did not help her with contracts, whether the contracts were directly with the city or if she was a subcontractor for a city contract;

   c.   KONG said Nuru did not extend contract application deadlines for contracts KONG wanted;

   d.   KONG said Nuru did not help KONG obtainwork as part of a contract with Clark Construction to do work at the San Francisco Animal Care and Control Facility, and said she never talked to Nuru about that contract;

  e. KONG said she did not talk to Nuru about the construction debris contract she had with the City;

  f. KONG said she never gave Nuru money.

 3. The statements and representations were false because, as will be described in further detail below, the FBI has obtained recorded wire communications, statements, and documents that prove her statements were false.

  **B.** **Qualifications and Background**

 4. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code. I am a Special Agent of the FBI and have been so employed since March 2009. I am sworn and empowered to investigate criminal activity involving violations of federal law.

 5. I am currently assigned to FBI's San Francisco Division Public Corruption Squad, which investigates abuse of public office in violation of criminal law, which includes fraud, bribery, extortion, conflicts of interest, and embezzlement. My investigative experience includes, but is not limited to: conducting wire communication interceptions; interviewing subjects, targets and witnesses; executing search and arrest warrants; handling and supervising confidential human sources; conducting surveillance; and analyzing phone records and financial records.

 6. During my employment with the FBI, I have received formal classroom and field training at the FBI Academy in Quantico, Virginia and graduated from the New Agent Training program. My training and experience includes, but is not limited to, public corruption, hate crimes, human trafficking, and foreign counter-intelligence. I have also received additional formal and on-the-job training from the FBI, as well as from the United States Attorney's office and other federal agents who have done extensive work in the areas of financial crimes and public corruption. I have participated in investigations involving public corruption, bribery, and fraud, and I have been the lead agent on several of those cases. I have worked on multiple

wiretaps while investigating public corruption, white-collar crime, and national security cases. I have received formal training in wiretaps at the FBI academy in Quantico, Virginia as well as on the job training while working on wiretaps in active investigations in multiple field offices.

7. To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including, but not limited to, physical and electronic surveillance, witness interviews, various types of infiltration to include confidential human sources, and cooperating sources. I have utilized pen register and trap and trace devices, mail covers, pole cameras, stationary video recording vehicles, undercover operations, and audio and audio/video recording devices.

8. I make this Affidavit based upon personal knowledge derived from my participation in this investigation, my experience investigating honest services wire fraud and other illegal activity relating to public corruption; as well as upon information I believe to be reliable from the following sources, among others:

    a. oral and written reports about this investigation that I have received from members of the FBI;

    b. physical surveillance conducted by the FBI, the results of which have been reported to me, either directly or indirectly;

    c. a review of KONG and Nuru's emails;

    d. recorded conversations; and

    e. confidential human sources.

9. Because this affidavit is being submitted for the purpose of establishing probable cause in support of the requested Complaint, it does not set forth each and every fact that I, or others, have learned during the course of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause for the requested Complaint.

10. Unless otherwise indicated, where actions, conversations, and statements of others are described below, they are related in substance and in part. In addition, unless otherwise noted, wherever in this Affidavit I assert that a statement was made, the information was

provided by another FBI agent, law enforcement officer, recording, or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have reviewed.

11. The telephone conversations transcribed in part below were derived from recorded communications. Collectively, these communications were documented in FBI reports and summaries. The reports are summarized based on agents' interpretations of the conversations. Some of these reports and summaries contain interpretations of coded words, cryptic language, and vague identifiers. It may be that subsequent review of the recorded conversations and verbatim transcripts may show changes from the summaries initially prepared. Quotations from the recordings are based on informal transcriptions of portions of certain key recordings, which may not be exactly the same as formal transcriptions that are later prepared.

## II.     RELEVANT LAW

12. Title 18, United States Code, Section 1001(a)(2), prohibits false statements or representations to a department or agency of the United States. The elements of the offense are as follows:

   a. The defendant made a false statement or representation;
   b. The statement was made within a matter within the jurisdiction of a department or agency of the United States;
   c. The statement or representation was material; that is, it had a natural tendency to influence, or was capable of influencing, the agency' decisions or activities.
   d. The defendant acted knowingly and willfully.

## III.    PROBABLE CAUSE

13. Florence KONG was interviewed by FBI Special Agents Tyler Nave and James Folger on March 4, 2020 at her home in Hillsborough, California. KONG invited the agents into the living room where the interview was conducted.

4

14. Before the interview began, both agents identified themselves as agents of the Federal Bureau of Investigation, and stated that they were there to ask her questions related to the FBI's investigation of Mohammed Nuru, and the arrest of Nuru on public corruption charges. At the time of the interview, the FBI suspected that Kong was providing gifts to Nuru, and in return, Nuru was helping her companies' obtain and increase their business with the City of San Francisco. The questions to KONG during the interview, and her answers, were material to that investigation.

15. The Agents advised KONG that they were only seeking the truth from her. At the end of the interview, KONG was told that lying to the FBI was a felony and illegal, and she was asked whether she wanted to change any of her answers. KONG said that she did not want to change any of her answers, and said she was truthful.

16. When asked about her relationship with Nuru at the beginning of the interview, KONG initially said she had trouble recalling who Nuru was. Shortly thereafter, when Agents explained that Nuru was the Director of Public Works for the City of San Francisco and had been recently arrested by the FBI, KONG said they were friends.

    **a. KONG Claims She and Nuru Do Not Discuss Business**

17. When asked about if she had ever talked with Nuru regarding her construction business KONG stated that they do not discuss business. I believe this statement is knowingly false because the FBI has intercepted over a dozen conversations between Nuru and KONG in 2018 and 2019 discussing KONG's business. In fact, the majority of their discussions revolved around business. In addition, I have reviewed multiple emails where Nuru and KONG discuss issues related to KONG's businesses, including communications regarding permitting at KONG's solid waste and construction debris recycling facility (SFR Recovery), the volume of business that the San Francisco Department of Public Works (DPW) was giving to SFR Recovery, KONG's efforts to win subcontract work for her company, Kwan Wo Ironworks, on the U.C. Hastings New Academic Center and the San Francisco Animal Care and Control Facility, as well as discussions involving Nuru and KONG working together with KONG's

5

investors to open a Bay Area casino.  For example:

18. On December 6, 2018, Nuru called KONG. In the recorded call, KONG pressed Nuru for help increasing the amount of construction debris sent by DPW to SFR Recovery.

19. On March 20, 2019, Nuru and KONG spoke by phone. In the recorded conversation, KONG complained to Nuru that she was not getting enough volume from DPW at SFR Recovery, and Nuru said that he had talked to another DPW employee about giving SFR Recovery more volume.[1]

### b. KONG States That Nuru Never Helped Her With Contracts

20. KONG was asked multiple times if Nuru ever helped her with contracts, whether the contracts were hers directly, or if she was acting as a subcontractor for another company. KONG repeatedly said that Nuru had not helped her and occasionally said that it was impossible for him to help. I believe these statements to be knowingly false because I have learned, from intercepted phone calls between Nuru and KONG, as well as emails between Nuru and KONG, that Nuru on multiple occasions did in fact help KONG with contracts KONG's companies had with the City of San Francisco.  This includes KONG's efforts to have Nuru help her obtain business with Clark Construction working on the San Francisco Animal Care and Control Facility, and to increase the volume of debris and solid waste KONG's business SFR Recovery was receiving from the City of San Francisco.

### c. KONG Says Nuru Never Extended a Contract Application Deadline For Her

21. KONG was also asked multiple times if Nuru had ever extended a contract application deadline for contracts KONG wanted, and each time, KONG said Nuru never helped her. I believe these statements to be knowingly false because of previously intercepted telephone calls between Nuru and KONG, and from emails between Nuru and KONG, in which KONG asked Nuru to extend a contract application deadline for her, and Nuru was able to do this for

---

[1] As of May 19, 2020, publicly available data on the city government's website shows that SFR Recovery was paid $42,000 by DPW for various contracts in FY 2018-2019 and $21,000 so far in FY 2019-2020.  The same website indicates that SFR Recovery has a remaining balance of $246,726 on its contract with DPW for road construction disposal. *See* http://openbook.sfgov.org/openbooks/cgi-bin/cognosisapi.dll.

her. For example:

    22.    On November 11, 2018, Nuru called KONG to discuss extending an application deadline for a contract to provide construction work on the San Francisco Animal Care and Control Facility so that KONG would have time to bid on it. The conversation was recorded and included the following exchange:

> NURU: So I saw your thing about the bid, so when is the bid due?
>
> KONG: Uh the bids due let me check hold on a sec. (ui) yeah uh (ui)
>
> NURU: Yeah because I can extend it if you want me to, only if you want me to
>
> KONG: Ohhh. that would be good. uh let me check uh, actually they say it's 6 months I'm sure. (ui) can extend for like a week or uh, then they (UI) able to make it happen.
>
> NURU: Ok so let me know if
>
> KONG: I can write you, He's checking I don't want to hold you up.
>
> NURU: Yeah but I
>
> KONG: (ui) one more week something
>
> NURU: yeah yeah, no I could if you want if you need that I will definitely see what I can do. I'm sure
>
> KONG: That would be wonderful and uh I I uh Michael told me that um if you're waiting for Carlo for (ui)
>
> NURU: Yeah we're gonna take care of that, no Carlo's gonna extend everything, everything is very good I didn't know, I didn't know that you know Michael needs to you know I  I when I (ui) he needs to just yeah, he just needs to tell me so because its easy for me you know, yeah yeah yeah, we will take care of that.
>
> KONG: Um the big day is November 15th.
>
> NURU: Ok.
>
> KONG: If you have like ten day then um
>
> NURU: Let me try, let me try,

7

    KONG: Great great great

    NURU: So we can extend it right now and uh

    KONG: ok.

23. In a subsequent call on November 14, 2018, Nuru called KONG and said that he helped her get an extension for bidding for this work at the San Francsico Animal Care and Control facility.

24. Based on my training and experience, and the intercepted calls made after the above call, I know that the contract was in fact extended and KONG was awarded the contract. This happened because Nuru extended the application deadline for her, which is why I believe KONG made false statements when she told Agents that Nuru never helped her with any contracts, that it was impossible to help, and that he never extended any contract application deadlines for her.

### d. KONG Says She Never Talked to Nuru About San Francisco Animal Care and Control Facility Contract With Clark Construction

25. KONG was asked if she had ever discussed with Nuru a contract to provide work for Clark Construction on its renovation of the San Francisco Animal Care and Control Facility, and she said she had not. I believe this statement to be knowingly false, based on my review of recorded telephone conversations and emails between KONG and Nuru.

26. As described in Section C above, on two dates in November 2018, KONG and Nuru discussed extending the deadline for KONG's company to bid on the SF Animal Care and Control Facility contract.

27. In addition, a month earlier, on October 1, 2018, KONG emailed Nuru. The subject line reads: "San Francisco Animal Care and Control Facility." KONG writes to Nuru: "Mohammed – Clark Construction is looking for subcontractors for the above project. I am looking forward to working with them." [2]

---

[2] According to documents produced pursuant to a subpoena to Kwan Wo Ironworks, Kwan Wo estimates the value of the San Francisco Animal Care and Control Facility contract work at $3.68 million.

  e. **KONG Says She and Nuru Never Discussed KONG's Construction Debris Recycling Contract**

  28. KONG was also asked if she ever discussed her debris recycling contract with Nuru. KONG said she had never talked to Nuru regarding the debris recycling contract. I believe this statement is knowingly false because I have learned, from intercepted phone calls between Nuru and KONG, as well as emails between Nuru and KONG, that on multiple occasions Nuru and KONG did in fact discuss KONG's recycling contract with the City. For example:

   a. On a March 20, 2019 recorded call, KONG complained to Nuru that SFR Recovery was not getting enough volume (ie: shipments of solid wastes) from DPW.

   b. On a December 6, 2018 recorded call, KONG told Nuru she needed to increase her revenue at SFR Recovery, saying; "So now, uh, we really need, uh, your help in, uh increasing our revenue."

   c. On a August 17, 2018 recorded call, KONG told Nuru that she needed more volume at SFR Recovery, and Nuru told KONG that he would work to get more volume from DPW.

  f. **Cash and Other Items of Value Provided to Nuru**

  29. KONG told agents that she never gave Nuru money. I believe this is another example of KONG's deceit. In a recorded interview, Nuru admitted that on at least one occasion, at his daughter's graduation party in 2019, KONG gave Nuru an envelope with $3,000 or $4,000 cash for his daughter, and that he kept some of it.

  30. Based on the recorded telephone conversations and my review of emails and documents, I further believe that during the time period in which KONG was seeking Nuru's help with SFR Recovery and Kwan Wo Ironworks' business with the City of San Francisco and prime contractors doing business with and in the City, KONG was providing monetary benefits to Nuru, including:

   a. KONG bought and installed a gate at Nuru's vacation home in Lodoga, California, which Nuru did not pay for;

   b. KONG was buying Nuru thousands of dollars in expensive meals, including a $1,152.28 meal at The Sea by Alexander's Steakhouse on July 10, 2018, and a $594 meal at Alexander's Steakhouse on April 22, 2019 that included $250 for a dry-aged steak trio, along with lamp chops, Truffle Mac and Cheese, and a $50 corkage fee.

   c. KONG purchased a Rolex watch for Nuru costing 291,935 Chinese Yuan (approx. $41,000). I have reviewed a receipt produced by Kwan Wo Iron Works for the purchase of this Rolex, and the receipt contains the serial number. On January 27, 2020, agents executed a search warrant at Nuru's home in San Francisco. During the search agents seized a Rolex watch, and a tag attached to the Rolex contained a serial number that matches the serial number on the receipt.



   *Rolex Seized From Nuru Home (01/27/2020)*

31. Based on my training and experience, and my review of the emails, documents,

and telephone conversations noted above, I believe KONG was trying to hide her illegal activity with Nuru, specifically, her payments to him in return for his help and influence in obtaining business with the City of San Francisco, and that she made false statements to the FBI to conceal her participation in the scheme.

    g.   **Additional Evidence of Intent to Deceive**

32. Agents asked KONG if she ever discussed with Nuru getting one of her family members a job with the city. KONG told the agents she never discussed this topic with Nuru. I believe this to be false because of recorded calls and emails I have reviewed. For example:

33. Agents intercepted a call between Nuru and KONG on April 6, 2019 where they discussed Nuru helping KONG's soon to be daughter-in-law get a job with City Department 1:

> KONG: And also about my daughter, um, my daughter in-law to be..
>
> NURU: Yah, nobody has called right?
>
> KONG: She did not, no no - not yet.
>
> NURU: I talked to [redacted] so he told me, you know he was still looking at it.
>
> KONG: Oh.
>
> NURU: Yeah, sent him the resume. Let me follow up with him and see. Yeah.
>
> KONG: Yah that would be really helpful. that would be good. That would be good.
>
> NURU: Yah, my other guy he is in Spain for uh, for uh, I think he went to Spain for a few weeks, but when he come back, he is my guy in there. See what he can do.

34. On April 19, 2019, Nuru forwarded to KONG an email from him to an official of City Department 1, where Nuru wrote: "Please see the attached resume for my good friend [redacted] She is looking to relocate permanently to San Francisco. Any assistance or guidance you can provide would be much appreciated. Best regards, Mohammed." On the same day, KONG responded to Nuru by email, stating: "Brother, Thank you very much! Florence Kong."

35. On June 10, 2019, KONG emailed Nuru. The subject line was "Resume –

[Redacted]" and KONG writes: "Mohammed, Thank you for helping [redacted] in her pursuing some job opportunities. She is a very passionate, hardworking, helpful and considerate person. I know that she can use her knowledge to help more patients. Florence." She attached a resume and cover letter.

### IV.    CONCLUSION AND REQUEST FOR SEALING

36.   Based on the foregoing facts, and my training and experience, I believe probable cause exists for the issuance of a criminal complaint and arrest warrant for KONG for making materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of 18 U.S.C. § 1001(a)(2).

37.   I further request that the Court order that all papers in support of this application, including this affidavit, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to the target or other subjects of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, giving the target an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

s/
_____
TYLER NAVE
Special Agent, Federal Bureau of Investigation

Sworn to and subscribed before
me this  1st   day of ~~May~~, 2020.
                       June

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

12